Filed 11/13/13  In re T.J. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re T. J. et al., Persons Coming Under the Juvenile Court Law. | |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M. J.,<br><br>Defendant and Appellant. | C073876<br><br>(Super. Ct. Nos. 09JVSQ2796601, 09JVSQ2796701, 09JVSQ2796801) |

M. J., the mother of the minors T. J., A. J., and D. J., appeals from the juvenile court's orders terminating parental rights as to D. J. and denying mother's petition to modify the visitation order.  (Welf. & Inst. Code,[1] §§ 395, 388, 366.26.)  She contends there is insufficient evidence to support the juvenile court's finding that D. J. was adoptable.  We affirm.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

1

BACKGROUND

In March 2009, the minors T. J. (born June 2001), A. J. (born April 2003), and D. J. (born February 2006) lived with mother and father. Following reports of the parents engaging in domestic violence and father's arrest for threatening to shoot mother, the Shasta County Health and Human Services Agency (agency) filed a dependency petition (§ 300) in April 2009, alleging the most recent domestic violence, the parents' history of domestic violence, the parents' mental health and substance abuse problems, and their history of referrals and voluntary services. The minors were detained and placed in foster care in April 2009.

The May 2009 jurisdiction/disposition report indicated father was convicted and placed on probation for spousal abuse. The minors were together with a foster family and doing well. The minors spoke to them about the parents, but the foster parents were not sure how much of what they said was true. A. J. reported smoking marijuana with his mom and another person, and T. J. spoke of a " 'brother who is in the cemetery.' " When asked about the statements, T. J. said, " 'sometimes we tell true stories and sometimes we don't.' "

The juvenile court sustained the petitions and ordered reunification services in May 2009.

The July 2009 report recommended moving T. J. to a separate foster home after the foster parents reported inappropriate sexual behavior between T. J. and her brothers. T. J. would not stay in her room at night and would try to touch A. J. and D. J. inappropriately while they slept.

The minors showed problems when visiting the parents; A. J. defecated in a closet after a visit and D. J. urinated in a closet after a visit. The foster parents sometimes had to bribe the minors to visit. The minors have said they did not want the visits and cried and screamed before them. Even though the visits were supervised, mother still behaved inappropriately, such as by discussing the dependency case with the minors and talking

2

about her boyfriends and her relationship with father in front of them. A. J. said he would "hang" himself if he had to have a visit with his father.

A. J. wanted the foster parent to help him get a gun so he could keep D. J. and himself safe. He wanted T. J. "to go live in another foster home so she will quit touching my pee pee." Following this statement, the minors made several statements about sexual abuse at the hands of family members. T. J. and A. J. reported that father touched their privates and taught them to touch each other's privates. Attached to the report was a handwritten note from A. J. in which he said his grandmother and grandfather molested him, and T. J. had kissed him and "sucks on my private area."

A therapist saw T. J. and A. J. T. J. appeared detached, had signs of post traumatic stress disorder (PTSD), lost her train of thought, and was very parentified. A. J. was very verbal about his past and relieved that someone listened to him. He knew too much about guns and violence; he could readily identify different types of firearms and showed how father pointed them at mother. Both children said they did not miss their parents.

In August 2009, the agency reported that all three minors were seeing the same therapist. A. J. and D. J. were moved to another foster home in August 2009 because the current foster parents could not meet the children's needs. A. J. enjoyed his new placement.

The September 2009 report noted D. J. was more violent after visiting father and quiet and tearful after visiting mother. The minors were in weekly sessions with their therapist. D. J. asked his foster brother if they were going to have sex. The foster parent made sure the two boys were not left alone together.

The December 2009 six-month report related that A. J. and T. J. were doing well in school and D. J. was doing well in preschool. Attached to the report was a parent-child evaluation by a psychologist.

The foster mother told the psychologist that D. J. would get defiant at school after visits with either parent. When disciplined, D. J. "shuts down. He completely checks

3

out." The foster mother reported her belief that the former foster parents told the minors their parents were bad for them. A. J. and D. J. anticipated visits with both parents after the new foster mother encouraged visiting.

The psychologist found it was likely that D. J. and A. J. were "exposed to extreme family dysfunction in the past," and it was also "likely that they had been exposed to inappropriate sexual behavior." However, it appeared "that the children's therapist is doing an extremely effective job in managing their issues and realigning the dysfunctional relationships between family members." The psychologist was thus "extremely impressed with the children's progress in their foster care homes and in therapy."

Reunification services were continued at the January 2010 six-month hearing.

The May 2010 12-month report recommended continued services for both parents. The minors were stable in their foster placements and doing well with their foster families. D. J. increased his defiant behavior for a few months at preschool, but recently improved. While there was a dramatic decrease in the minors' negative statements about their parents, they still did not trust them. A. J. and D. J. both told their foster parents they did not want to go home and wanted to stay at the foster home forever. Upon leaving a recent visit with mother, D. J. told his foster mother, " 'run her over. I don't like my mom.' "

A caregiver form attached to the report stated that D. J. shook notably when eating. D. J.'s teacher said that he was so defiant it took two adult teachers to get him to do a brief timeout. The child had increased aggression towards A. J., and increased his crying and moodiness over the last couple of months.

Services were continued at the 12-month hearing in May 2010.

The October 2010, 18-month report recommended terminating services for both parents. T. J. was still separated from A. J. and D. J. A. J. was on medication for ADHD and said he wanted to be a girl. He also stole bras and undergarments and fondled them

4

in bed. D. J. hit other children over and over without provocation. He would throw objects like rocks, rakes, and blankets. D. J. also cried uncontrollably, and would cry and yell himself to sleep after visits.

The foster mother reported an incident where A. J. stared at the wall and made no response for about 20 minutes. On a day father visited, D. J. hit A. J. for no reason and then hit his foster brother over and over for no reason. He also told A. J. he would live in heaven in two days, which upset A. J.

A December 2010 addendum report contained a report from the therapist diagnosing A. J. and D. J. with anxiety disorder and physical abuse of a child, including exposure to domestic violence. A. J.'s teacher had to talk to the foster parent about his " 'wild' " behavior, which included being uncooperative with the teacher, making inappropriate remarks, and standing on his chair. His behavior improved after a few weeks at school.

The juvenile court terminated services for both parents at the 18-month hearing.

The April 2011 section 366.26 report recommended continuing the case for 180 days to find an adoptive family. An adoptive home was not yet selected, but relatives in Southern California requested placement and were being assessed. If that failed, the agency would search for a home to take all three minors. A cursory Internet search found seven adoptive families in California open to a sibling group like the minors. A search on a national Web site found 413 families in the United States open to adopting a sibling group of three.

The report said the minors had characteristics which would make them attractive to adoption -- they were attractive, developmentally on target, healthy, successful in school, active, and bonded together as a group. It also stated that the minors had mental health needs and their behavior presented significant challenges in the home.

The foster parents said A. J.'s therapy was successful, as he no longer stole women's undergarments and hid them in his room. They reported D. J. loved preschool,

5

and was very loving, social, loved animals, and was very smart. A. J. continued to take medication for ADHD.

In May 2011, the juvenile court identified adoption as the permanent plan and set a hearing for October 2011.

In October 2011, mother filed a petition for modification (§ 388) seeking reinstatement of reunification services, and the agency filed a section 388 petition seeking decreased visitation following allegations that the minors had been abused by their parents.

The October 2011 section 366.3 report requested an additional 180 days to find adoptive families. The minors continued to do well in their foster placement. The plan to place T. J. with her brothers was precluded due to significant issues with all three children. The report also found that the minors had "no diagnosed mental health needs but behavior at times does present significant challenges in the home."

In October 2011, the juvenile court terminated visitation for father and continued the dependency. The juvenile court denied mother's section 388 petition later that month.

The April 2012 section 366.26 report recommended placing the minors with a confidential caregiver with the goal of adoption. Adoptive homes had not been selected, but T. J.'s foster parents were interested in adopting her or some other long-term plan, while the foster mother of D. J. and A. J. was interested in adopting them. The agency located eight adoptive families interested in adopting a sibling set with similar characteristics as A. J. and D. J. The report also noted D. J. was diagnosed with adjustment disorder with mixed emotions and conduct.

A psychologist's preadoption evaluation of D. J. reported the foster mother's greatest concern was D. J.'s general defiance and refusal to do what is requested of him. The foster mother described D. J. as funny, lovable, happy, and affectionate. He was bonded to A. J. and never imagined not living with him.

6

The report also included a March 2012 letter from A. J.'s therapy provider stating he suffered a marked increase in controlling and aggressive behaviors toward D. J. after seeing mother picking up her boyfriend's son at his school. When discussing the matter in therapy, A. J. broke down and said, "happy and afraid about mom." Since the incident, A. J. and D. J. became more hyper at home and got into more fights.

In a May 2012 hearing, the juvenile court set a permanency review hearing for November 2012.

In October 2012, the agency filed a section 388 petition to change A. J.'s placement because he was assaulting the other children in the home and his foster mother gave her seven-day notice for him. The agency requested A. J.'s placement in a level 12 or lower group home.

In a December 2012 report, the agency said A. J. was moved to a group home in October 2012, where he developed a close relationship with the group home mother. He had two seizures during the year. D. J. was being transitioned to a prospective adoptive home, where he already spent several days and had overnight visits.

A psychological evaluation of the minors diagnosed T. J. and A. J. with PTSD and sexual abuse of a child, and D. J. with adjustment disorder with mixed emotions and conduct. A. J. remained on medication for ADHD.

Mother filed another section 388 request to reinstate services in December 2012.

A section 366.26 report filed in March 2013 recommended terminating parental rights as to D. J., and a permanent plan of placement with confidential caregivers with a specific goal of adoption for T. J. and A. J.

D. J. was with his prospective adoptive parents, whom he called mom and dad, since the middle of December 2012. He was enjoying the first grade, going on hikes with the current family, and playing board games with them. According to the report, he had no current behavioral or mental health issues. Should the current family be unable to

7

adopt him, a preliminary search identified more than 74 potential matches, allowing the agency to conclude it was highly likely he would be adopted.

The report also noted that the minors had no visits with either parent since October 2011. The minors' therapist reported that she was discontinuing her sessions with D. J. as "he appears to be settling in very well to his prospective adoptive home." Sessions with T. J. were put on hold, as she "has been blossoming in the home of her foster parents, who will very likely adopt her at some point in the not-too-distant future." A. J. continued weekly sessions.

In March 2013, the juvenile court denied mother's section 388 petition and terminated parental rights as to D. J.

DISCUSSION

Mother contends there was insufficient evidence to support the juvenile court's finding that D. J. was adoptable. We disagree.

" 'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citation.]" (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) "In order for the court to select and implement adoption as the permanent plan, it must find, by clear and convincing evidence, the minor will likely be adopted if parental rights are terminated." (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164; § 366.26, subd. (c)(1).)

"The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citations.]" *(In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) On the other hand, "the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and

8

other matters relating to the child are not likely to dissuade individuals from adopting the minor.  In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*.  [Citation.]"  (*Id*. at pp. 1649-1650.)

We review the juvenile court's finding that the minors are likely to be adopted under the substantial evidence standard, giving it the benefit of every reasonable inference and resolving any evidentiary conflicts in favor of affirming.  *(In re I.I.* (2008) 168 Cal.App.4th 857, 869.)

Mother argues that D. J. will wind up like his older brother A. J., who was placed in a group home because of his behavior.  She notes the second foster parent described D. J. " 'check[ing] out' " from time to time, and once shared the same diagnosis as A. J., anxiety and physical abuse of a child, including exposure to domestic violence.  Calling the therapist's decision to discharge D. J., "unthinkable," mother claims the therapist should have requested several more sessions with D. J. "after transitioning into a prospective adoptive home given the child's traumatic history and significant behavioral problems."  Finally, mother concludes that D. J.'s "individual traits," his "palpable" similarities with A. J, his placement problems, his defiance at school, his bouts of aggression toward his brother, shaking while eating, and checking out from reality, the loss of his brother from an adoptive home, and the therapist's decision to discharge D. J. made him unlikely to be adopted.

Mother overstates D. J.'s impediments to adoption.  The surface similarities between A. J. and D. J. pointed out by mother overlook the significant differences in their respective experiences and behaviors.  D. J. was only three when detained and therefore did not experience the same degree of trauma from the domestic violence and sexual abuse while in his parents' care as did A. J.  Unsurprisingly, also D. J. showed fewer and less severe behavioral and mental problems than A. J.  Unlike A. J., he was never

9

administered medication, and, unlike both siblings, D. J. was never removed from a placement due to misbehavior.

Mother's contention that the therapist's decision to discharge D. J. was unsound is no more than speculation. By the time parental rights were terminated, D. J.'s behavior was significantly better than when he was detained. A psychological examination more than three years before termination of parental rights found the minors were making considerable progress in therapy. In light of D. J.'s much improved behavior and the previous efficacy of therapy, the juvenile court could reasonably conclude that the therapist correctly assessed D. J. as mentally healthy.

D. J. was comparatively young, healthy, loving, intelligent, and recovering from the emotional scars inflicted by his parents. He had moved in with a potential adoptive family and the agency identified numerous other prospects if the placement failed. The juvenile court's finding of adoptability is supported by substantial evidence.

CONCLUSION

The juvenile court's orders are affirmed.


      ROBIE     , Acting P. J.


We concur:


     BUTZ     , J.


     HOCH     , J.